**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHARON THOMAS AGDIPA,<br>C/O JONES DAY<br>51 LOUISIANA AVENUE, N.W.<br>WASHINGTON, D.C. 20001<br><br>Plaintiff,<br><br>v.<br><br>ANIL OZGE ERTAY, HUSNU SINAN<br>ERTAY<br>4291 EMBASSY PARK DRIVE, N.W.<br>WASHINGTON, D.C. 20016<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 24-cv-01491

JURY TRIAL DEMANDED

## COMPLAINT

Sharon Thomas Agdipa ("Plaintiff" or "Ms. Agdipa"), by and through her undersigned attorneys, brings this Complaint against Anil Ozge Ertay (Ms. Ertay) and Husnu Sinan Ertay (Mr. Ertay) (collectively "Defendants" or "The Ertays") and hereby alleges the following:

### I. INTRODUCTION

1.      Ms. Agdipa, a Filipina native, was lured to the United States by Mr. and Ms. Ertay, two high-ranking Turkish diplomats who offered Ms. Agdipa employment as a nanny, promising lawful wages and a private room in their Washington, D.C. home.  Ms. Agdipa accepted the Ertays' employment offer, excited about earning a salary that she planned to use to support herself and her family in the Philippines.  But Ms. Agdipa had been deceived from the start.  The Ertays had no intention of fulfilling their promises.  As she would learn upon arriving

in D.C., the Ertays had trafficked Ms. Agdipa to the United States from the Philippines for the purposes of forced labor.

2.      From February 2020 to May 2021, the Ertays caused Ms. Agdipa to suffer greatly: they stole her wages, constantly berated and cursed at her, forced her to use cleaning chemicals that burned her eyes and hands, and failed to provide her with regular meals while simultaneously restricting her from regularly cooking her own food.

3.      The Ertays also prevented Ms. Agdipa from seeking help during this time.  They took advantage of Ms. Agdipa's vulnerable immigration status by threatening to call law enforcement to deport her and isolated her from neighbors and other nannies.  To avoid consequences for their knowingly wrongful actions, the Ertays forced Ms. Agdipa to provide false answers to the U.S. State Department about her living and working conditions.

4.      Ms. Agdipa suffered at the hands of the Ertays during the entire length of her employment, which started in February 2020 and ended when she was finally able to escape and seek help in May 2021.  Accordingly, this action seeks to recover for the human trafficking, forced labor, and tortious treatment that the Ertays inflicted upon Ms. Agdipa during this time frame, while they were employed at the Embassy of Turkey in Washington, D.C.

* * *

5.      In November 2019, Ms. Ertay persuaded Ms. Agdipa to travel to the United States by promising that, in her role as the Ertays' nanny and housekeeper, Ms. Agdipa would be paid a fair wage and have suitable living and working conditions.  Ms. Ertay memorialized these promises in the employment contract that she had Ms. Agdipa sign as part of her visa application to work in the United States.  Among other provisions, the employment contract provided that Ms. Agdipa would work 35 hours each week at a wage compliant with federal and local

minimum wage requirements, and that she would receive overtime pay for any time worked beyond that.

6.     The terms and conditions of Ms. Agdipa's employment contract were far from the truth upon her arrival to the United States.  From February 2020 to May 2021, Ms. Agdipa worked as a live-in housekeeper and childcare provider in the Ertays' Washington, D.C. home. Ms. Agdipa was primarily responsible for care of the Ertays' five-year-old son, but was also required to handle work including cleaning, cooking, gardening and outdoor work, and various other tasks as requested by the Ertays.  Despite the 35-hour workweeks she was contracted for, Ms. Agdipa worked over 80 hours a week: her typical working hours were Monday through Saturday, from 7:00 a.m. to 9:00 p.m., but she was also required to be immediately responsive to the Ertays' requests at any hour of the day or night.

7.     The Ertays did not pay Ms. Agdipa for the majority of her work.  Despite her long hours, and the explicit overtime wage requirement in the employment contract, the Ertays did not pay any overtime wages.  In fact, though the Ertays sent payment for the base 35-hour workweek to Ms. Agdipa each month, they routinely forced her to return a large percentage of these monthly wages.  After the Ertays sent a paycheck to Ms. Agdipa, they would require her to withdraw a percentage of that check in cash from an ATM and give that cash back to the Ertays. Indeed, they would drive her to the bank for the explicit purpose of requiring Ms. Agdipa to withdraw money to give to the Ertays while they waited in the car.

8.     Ms. Agdipa suffered emotional and psychological abuse due to the working conditions created by the Ertays.  The Ertays were verbally and emotionally abusive to Ms. Agdipa, failed to provide a private room for her, deprived her of adequate food, forbade her from speaking with peer domestic workers, and failed to provide adequate medical treatment or sick

days, including causing Ms. Agdipa's COVID-19 vaccine to be delayed.  At various times during Ms. Agdipa's employment in the Defendants' home, the Defendants threatened her. Both Defendants threatened to withhold Ms. Agdipa's immigration documents, have her deported, or call law enforcement on her if either she complained about her working conditions or if she tried to leave the Ertays' employment and find other work.  The Ertays used these threats to force Ms. Agdipa to surrender her wages to the Ertays as described above.  Ms. Agdipa was unable to receive a break from this treatment: on her single day off each week, Ms. Agdipa was constructively confined to the Ertays' home due to their refusal to provide her with a key to the house.

9.      In May 2021, Ms. Agdipa was able to escape from the Ertays and seek humanitarian relief.

10.      The Ertays are believed to have resided in Washington, D.C. until at least September 2023.

11.      The Ertays' recruitment of Ms. Agdipa, including inducing her to travel to the United States, as well as their threats of deportation to force Ms. Agdipa to work for them, violate the federal Victims of Trafficking and Violence Protection Reauthorization Act ("TVPRA").  The Ertays' monthly theft of the wages that they were contracted to pay to Ms. Agdipa violates the federal Fair Labor Standards Act ("FLSA"), the D.C. Minimum Wage Revision Act ("DCMWRA"), and the D.C. Wage Payment and Collection Law ("DCWPCL"), and also constitutes common law breach of contract and unjust enrichment.   Finally, the Ertays' threats and abusive treatment of Ms. Agdipa during her employment constitutes intentional infliction of emotional distress and fraud.

## II. JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 18 U.S.C. § 1595.  This Court has supplemental jurisdiction over Plaintiff's causes of action arising under D.C.'s Wage Payment and Collection Law.  It further has supplemental jurisdiction over Plaintiff's causes of action arising under D.C.'s common law for intentional infliction of emotional distress, fraud, breach of contract, and unjust enrichment.  All of these state law actions are part of the same case or controversy as the federal TVPRA and FLSA causes of action.

13.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## III. PARTIES

14.     Plaintiff Sharon Thomas Agdipa is a citizen of the Philippines.  She is currently residing in Virginia.  From approximately February 5, 2020 to May 5, 2021, Ms. Agdipa resided at the Ertays' home at 4291 Embassy Park Drive NW, Washington, D.C. 20016.

15.     At all times relevant to this Complaint, Defendant Husnu Sinan Ertay held the role of Deputy Chief of Mission of the Republic of Turkey.  Mr. Ertay's role is a high-ranking one, second only to the Turkish Ambassador.  While working at the Embassy, Mr. Ertay resided at 4291 Embassy Park Drive NW, Washington, D.C. 20016.

16.     At all times relevant to this Complaint, Defendant Anil Ozge Ertay held the role of diplomatic Counselor of the Republic of Turkey.  While working at the Embassy, Ms. Ertay resided at 4291 Embassy Park Drive NW, Washington, D.C. 20016.

## IV. FACTS

**A.      Ms. Agdipa's Work History and Introduction to the Ertays**

17.      Ms. Agdipa was raised in the Philippines in a low-income family.  She had nine

siblings, and to help provide for her large family, Ms. Agdipa worked as a nanny at a relatively

young age.

18.      In 1999, Ms. Agdipa began working for a Filipino diplomat's family.  The

diplomat was pleased with her work, so much so that, in 2003, he requested that she travel to the

U.S. to continue working for his family.  Ms. Agdipa worked for this diplomat for a brief time

period in the U.S., during which she experienced reasonable working conditions and hours. She

voluntarily left this position to return home to find work closer to her family.  Since that time,

Ms. Agdipa has consistently worked as a caretaker in various countries.

19.      In 2018, Ms. Agdipa was living and working in Cyprus as a caretaker for an

elderly member of a Turkish family.  Ms. Agdipa had a good relationship with this employer and

with her employer's family members and had reasonable working conditions and hours.  While

in Cyprus, a family member of Ms. Agdipa's employer asked her to join his family in New York

City, New York, as a nanny.

20.      Ms. Agdipa accepted this offer.  From 2018 to 2019, she worked in New York

City under a G-5 visa as a nanny for Turkish nationals.  Ms. Agdipa had a positive relationship

with this family, and experienced good working conditions and reasonable hours in their employ.

21.      From her time working as a caretaker in Cyprus through her time working as a

nanny in New York, Ms. Agdipa worked for the same Turkish family for a total of five years.

22.      After Ms. Agdipa's employment contract with the Turkish family ended, the

family expressed a desire to help Ms. Agdipa find additional work.  The family connected her

with another Turkish family residing in the United States.  This family was the Ertays.

**B.      Trafficking into the United States**

23.      After her contract with the Turkish family ended in 2019, Ms. Agdipa left the United States and traveled back to the Philippines.  While in the Philippines, Ms. Agdipa communicated with the Ertays in late 2019 about a potential job for the Ertays as a domestic worker.

24.      During these communications, Ms. Agdipa informed the Ertays that part of the money she earned while working for them would be sent to the Philippines to help take care of her family.  Ms. Agdipa shared that she needed her wages to help her nephew attend school and to care for her family.

25.      On or around November 22, 2019, the Ertays formally offered Ms. Agdipa a position as a live-in-nanny and housekeeper at their residence in Washington, D.C.  The offer letter provided that Ms. Agdipa's term of employment was from February 2020 through September 2023.  The offer letter also included an A-3 and G-5 Employment Contract ("Contract"), attached hereto as Exhibit A.

26.      The Contract stated that Ms. Agdipa was hired to perform childcare, housework, cooking, and other unspecified duties for the Ertays. The Contract also stated that Ms. Agdipa would work 35 hours per week, Monday through Saturday, for $14 per hour, and would be paid $980 USD every two weeks.  The Contract also stated that Ms. Agdipa would be paid $21 for all hours considered overtime under U.S. federal, state, or local laws.  The Contract stated that private room and board would be provided by the Ertays, with no cost to Ms. Agdipa.

27.      After agreeing to the terms of this contract, Ms. Agdipa traveled to the United States in February 2020.  On February 5, 2020, Ms. Agdipa began working for the Ertays in D.C. as a domestic worker and lived at their D.C. residence.

**C.    Ms. Agdipa's Salary and Working Hours**

28.    Ms. Agdipa's initial salary from the Ertays was $14 per hour. Accordingly, Ms. Agdipa expected to receive $980 every two weeks for a 35-hour work week. *See* Ex. A.  The D.C. minimum wage was $14 per hour from July 1, 2019 through June 30, 2020.  On July 1, 2020, the D.C. minimum wage increased to $15 per hour.  Subsequently, on or around July 2020, Ms. Agdipa's Contract was modified to state that Ms. Agdipa would be paid $15 per hour and would receive $1,050 every two weeks.  *See* Modified A-3 and G-5 Employment Contract ("Second Contract") attached hereto as Exhibit B.

29.    From the beginning of her employment as the Ertay's live-in-nanny and housekeeper, the Ertays did not pay Ms. Agdipa as they had contractually agreed.

30.    Each month, the Ertays would make two bank transfers to Ms. Agdipa through Zelle, a mobile money transfer application, containing the contractually-obligated amount.  But within days of paying Ms. Agdipa's salary, Mr. or Ms. Ertay would instruct Ms. Agdipa to go to an ATM and require Ms. Agdipa to withdraw a certain amount of money in cash, and then return that cash to the Ertays.

31.    For example, in June 2020, the Ertays sent two Zelle payments of $980 each to Ms. Agdipa, totaling a monthly salary of $1,960.  However, three days after paying her full June 2020 salary, the Ertays drove Ms. Agdipa to an ATM Machine, and forced her to withdraw $1,350 from her account.  When she returned to the car, they forced her to give them the money she withdrew.  As a result, Ms. Agdipa actually received $610 for an entire month of work, rather than the $1,960 the Ertays had contractually agreed to pay her.

32.    Ms. Ertay promised Ms. Agdipa they would compensate her for the amount that they forced her to withdraw when the Ertays' son went to school in August.  However, the Ertays never returned these payments.  In total, Ms. Agdipa was required to return approximately one-

third of the wages (totaling $9,450) she was paid during the 15 months she worked for the Ertays:

a.  On March 9, 2020, the Ertays required Ms. Agdipa to withdraw and pay to them $930 in cash.

b.  On May 4, 2020, the Ertays required Ms. Agdipa to withdraw and pay to them $1,320 in cash.

c.  On July 3, 2020, the Ertays required Ms. Agdipa to withdraw and pay to them $1,350 in cash.

d.  On August 25, 2020, the Ertays required Ms. Agdipa to withdraw and pay to them $1,320 in cash.

e.  On October 13, 2020, the Ertays required Ms. Agdipa to withdraw and pay to them $1,320 in cash.

f.  On December 14, 2020, the Ertays required Ms. Agdipa to withdraw and pay to them $1,200 in cash.

g.  On February 1, 2021, the Ertays required Ms. Agdipa to withdraw and pay to them $500 in cash.

h.  On February 22, 2021, the Ertays required Ms. Agdipa to withdraw and pay to them $500 in cash.

i.  On March 22, 2021, the Ertays required Ms. Agdipa to withdraw and pay to them $510 in cash.

j.  On April 26, 2021, the Ertays required Ms. Agdipa to withdraw and pay to them $500 in cash.

33.     In addition to the wages Ms. Agdipa lost due to the Ertays' theft through forced repayments, Ms. Agdipa was also forced into routinely providing free overtime labor.  Even though the Contract provided that Ms. Agdipa would work from 11:00 a.m. to 5:00 p.m. on Monday through Friday and from 11:00 a.m. to 4:00 p.m. on Saturday, this schedule was far from Ms. Agdipa's reality.  Most days, she worked from 7:00 a.m. to 10:00 p.m. or 11:00 p.m., nine to ten hours over the schedule agreed upon in the Contract.  In addition to this schedule, Ms. Agdipa would be required to provide on-call services for the Ertays.  For example, when the Ertays had a party or had guests staying late, Ms. Agdipa was forced to stay up to clean and tidy up after the guests, regardless of the time.  And if the Ertays' son woke up at 5:00 a.m., Ms. Agdipa was required to begin caring for him at 5:00 a.m.  Although the Contract required the Ertays to pay overtime wages for hours going beyond the contracted 35-hours per week, the Ertays never once paid Ms. Agdipa any overtime wages.

34.     This schedule was unrelenting and was without regard for Ms. Agdipa's health or personal circumstances.  The Ertays exploited Ms. Agdipa's immigration status and lack of knowledge about U.S. labor laws to manipulate her and control her, threatening her with additional harm for failure to meet these demands.

35.     The Ertays were fully aware that the long hours, lack of overtime pay, and wage theft were in violation of the employment contract.  In fact, Ms. Ertay told Ms. Agdipa that she must provide false answers to the State Department Office of Foreign Missions ("OFM") in order to get approval for Ms. Agdipa's employment contract.

36.     Shortly after Ms. Agdipa began working for the Ertays, OFM called the Ertays' home to speak with Ms. Agdipa to ensure that the terms of her employment contract were being met.  This call from the OFM is a standard State Department check-in program for all domestic

workers employed by diplomats, a program prompted by significant abuse of these domestic

workers in the past.  While Ms. Agdipa was on the phone with OFM, Mr. and Ms. Ertay stood

near Ms. Agdipa so that they could hear OFM's questions.  The Ertays instructed Ms. Agdipa to

tell OFM that she would receive the salary and payment terms agreed to in the Contract, despite

the Ertays' knowledge that they were violating those terms.  The Ertays forbade Ms. Agdipa

from providing information to OFM outside of what they had instructed her to say.

37.     Upon information and belief, the Ertays never intended to honor the Contract.

They entered into the Contract with Ms. Agdipa for the purposes of obtaining a A-3 visa for Ms.

Agdipa to come to Washington, D.C. as a domestic worker while they served their respective

terms of diplomatic missions.

38.     In or around July 2020, the salary requirements for domestic workers increased.

Accordingly, in July 2020, the Ertays were required by the U.S. Department of State to enter into

a new contract with Ms. Agdipa (the "Second Contract"), providing for an increased salary.  The

Ertays assured Ms. Agdipa that they would pay her the salary provided in the Second Contract,

which contained the same 35-hour workweek and overtime pay requirements.

39.     Ms. Agdipa signed the Second Contract in July 2020.  However, as with the first

Contract, the Ertays did not honor the base payment or overtime payment terms, and still

required Ms. Agdipa to return a large percentage of her paycheck each month, and to work the

same long hours she maintained under the first Contract.  When OFM called to speak with Ms.

Agdipa about the Second Contract, the Ertays again stood nearby and monitored Ms. Agdipa's

answers, requiring her to provide the responses that OFM would accept, rather than allowing her

to share the truth of her forced labor, long hours, and the Ertays' wage theft.

**D.      Ms. Agdipa's Working Conditions and Forced Labor**

40.      Ms. Agdipa's contractual duties included housekeeping and caring for the Ertay's five-year-old son.  In performing these duties, she was subjected to grievous working conditions and to daily emotional and psychological abuse from Mr. and Ms. Ertay.

41.      Ms. Ertay regularly disregarded Ms. Agdipa's health and forced her to combine certain chemicals and solutions to clean the house.  Ms. Agdipa pleaded with Ms. Ertay and explained that the combination of these chemicals would burn her.  Ms. Ertay refused to listen. As a result, Ms. Agdipa suffered burns to her hands and eyes from the fumes and chemicals.

42.      Mr. and Ms. Ertay verbally harassed and berated Ms. Agdipa.  Ms. Ertay would express her anger at Ms. Agdipa by cursing at her and threatening to throw her out on the streets or send her back to the Philippines.  On numerous occasions, Mr. Ertay would follow Ms. Agdipa around the house, screaming at her and insulting her.

43.      The Ertays routinely shamed and questioned Ms. Agdipa's competence.  On one occasion, the Ertays' son purposely spit on Ms. Agdipa.  Ms. Ertay failed to correct him.  On another occasion, the Ertays' son called Ms. Agdipa "stupid."  Not only did Ms. Ertay fail to correct her son yet again, but she also reaffirmed the name-calling and said: "yes, Sharon is stupid."

44.      The Ertays failed to provide regular meals for Ms. Agdipa.  She was rarely permitted to cook her own food.  There were days when Ms. Agdipa went without food, and she had to depend on food donations from another family's nanny, which were provided to her on rare occasions.  Ms. Agdipa had to receive these donations in secret, so that she would not be punished by the Ertays.  When Ms. Agdipa did eat, breakfast would typically be her only full meal for the day.  Through the afternoons and evenings, Ms. Agdipa barely managed to survive

off of instant ramen noodles, inedible rice, and canned goods.  Even these were difficult to eat, since the working hours the Ertays required did not permit Ms. Agdipa to take a meal break.

45.     While Ms. Agdipa was employed by the Ertays, they denied her medical care and interfered with her access to healthcare.  Ms. Agdipa worked for the Ertays during the height of the COVID-19 pandemic.  When Ms. Agdipa was eligible to receive the COVID-19 vaccine, Ms. Agdipa wanted to immediately get vaccinated.  But the Ertays did not permit her to go and receive the vaccination and berated her for requesting the minimal time away required to take the vaccination.  When the Ertays finally agreed to take her to the clinic to receive the vaccination, they left her at the clinic rather than waiting as agreed to take her home.  With the fear of deportation due to the continuous threats of the Ertays on her mind, Ms. Agdipa was forced to walk two hours back to the Ertays' home.  The Ertays calculated Ms. Agdipa's estimated walk time, and required her to confirm that she had returned to their home and had started on her tasks exactly two hours after she left the clinic.

46.     When Ms. Agdipa suffered burns as a result of the chemicals that she was required her to use for cleaning, the Ertays failed to provide her with any medical treatment. These burns left scarring on Ms. Agdipa's hand.

47.     Even though the Contract provided Ms. Agdipa with sick leave, the Ertays failed to provide her with time off when she was sick.  She was forced to work when she was visibly ill.

48.     On at least one occasion, Ms. Agdipa was unwell to the point that she fainted and hit her head.  Upon coming to, the Ertays still required Ms. Agdipa to continue working as normal, rather than allowing her to rest and recover.

49.     Ms. Agdipa received Sunday off, but she was typically confined to the Ertays' house and unable to make use of her time off.  The Ertays refused to give Ms. Agdipa a key to their home and did not permit her to leave the door unlocked.  Therefore, if Ms. Agdipa left the home, she would have faced consequences from the Ertays for leaving the door unlocked.  And if someone was home to lock the door behind her, Ms. Agdipa had no guarantee that she would be able to get back into the house at a specific time and would have to risk being stranded outside without her belongings.

50.     The Ertays promised, both informally and in the formal employment contract, to provide Ms. Agdipa with room and board with a private bedroom, but they did not fulfill this promise.  Ms. Agdipa was required to sleep in the basement, which had no lock or other manner of preventing others from entering her space.  In fact, Mr. Ertay entered Ms. Agdipa's living and sleeping space every single day and several times throughout the day, including at odd hours. Mr. Ertay used the basement as his makeshift closet, and he chose to regularly use the basement bathroom, even though there were other bathrooms in the home.  Mr. Ertay would require Ms. Agdipa to vacate the basement in the early morning and late-night hours, so that he could use the bathroom to get ready before leaving for work and again upon returning home from work.

51.     The Ertays knew that the living conditions that Ms. Agdipa was subjected to were unacceptable.  Ms. Agdipa was highly susceptible to the Ertays' threats due to their highly ranked positions at the Embassy, and the Ertays exploited this vulnerability.  In addition to the inaccurate statements that Ms. Ertay required Ms. Agdipa to provide to OFM about her salary, Mr. Ertay also required Ms. Agdipa to provide untrue statements about her living conditions. Specifically, while listening in on Ms. Agdipa's phone conversation with OFM as described in paragraph 36, Mr. Ertay instructed Ms. Agdipa to inform OFM that she had her own private

bedroom with a window at the Ertays' home. The Ertays knew that the non-private basement area with no window where they required Ms. Agdipa to stay violated the Contract which required that, "**at a minimum**, [Ms. Agidpa] w[ould] be provided adequate and reasonable accommodations, including a **private** bed and access to a bathroom, kitchen facilities, and proper food storage." Exs. A and B. The Ertays intentionally prevented her from speaking truthfully about her poor living conditions with OFM.

52.     The Ertays also prevented Ms. Agdipa from making new friends or acquaintances in D.C. The Ertays became angry and yelled at Ms. Agdipa if they saw her talking with others, especially other Filipina nannies. The Ertays isolated Ms. Agdipa. The only peer Ms. Agdipa was able to speak with was a nanny for a friend of the Ertays' son. Even then, Ms. Agdipa was fearful of speaking about her treatment at the hands of the Ertays.

53.     Ms. Agdipa tried to raise concerns about her wages, living conditions, and working conditions with the Ertays on multiple occasions, but these attempts resulted in the Ertays threatening Ms. Agdipa with deportation, police action, withholding of documents, and refusal to pay her wages. Ms. Agdipa was vulnerable to the Ertays' control and exploitation. Unaware of federal labor and human trafficking laws, Ms. Agdipa had no understanding of the magnitude of the Ertays' criminal misrepresentations. Moreover, by forbidding Ms. Agdipa from making any social connections outside of their household and confining her to their home, the Ertays created an environment of isolation and constant surveillance. The Ertays' actions led Ms. Agdipa to believe that she could not seek help from law enforcement or other legal relief without risking deportation or other ramifications.

E.     **Ms. Agdipa's Attempt to Find Other Employment**

54.     Due to the theft of her wages, as well as the constant emotional and psychological abuse, Ms. Agdipa began forming a plan to find other employment. In an attempt to be

transparent, Ms. Agdipa shared her plan to seek other work after her contract with the Ertays

ended in September 2023.  She first told Ms. Ertay in October 2020.  Ms. Agdipa's plan included

enlisting the help of an employment agency as she had hopes of obtaining employment in the

hospitality industry.  Ms. Ertay initially promised to accept and support Ms. Agdipa's job search.

However, shortly after that initial promise, Ms. Ertay threatened to withhold Ms. Agdipa's

documents and refuse to sign necessary paperwork if Ms. Agdipa should actually try to leave for

another job.

**F.    Ms. Agdipa's Escape from the Ertays**

55.    Ms. Agdipa was fearful of the Ertays' threats to withhold her documents and to

deport her.  But the wage theft, psychological abuse, insomnia and isolation Ms. Agdipa

experienced caused her to reach her breaking point in May 2021.

56.    On May 5, 2021, at Ms. Ertay's request, Ms. Agdipa began the day by taking the

Ertays' son to the park.  Another nanny and child were at the park when Ms. Agdipa and the

Ertays' son arrived.  To be polite, Ms. Agdipa spoke with the nanny and child.  Ms. Ertay arrived

at the park and, upon seeing Ms. Agdipa speaking to another nanny and child, flew into a rage.

She began screaming at and berating Ms. Agdipa, accusing her of failing at her job duties and

failing to care for the Ertays' son, and demanding that Ms. Agdipa return to the Ertays'

residence.  Shaken and afraid, Ms. Agdipa complied.

57.    Ms. Ertay's abusive behavior continued and escalated throughout the day,

reaching the point at which Ms. Agdipa sought to flee the abuse.

58.    That evening, when the Ertays were preoccupied and elsewhere in the home, Ms.

Agdipa seized the opportunity to escape, abandoning most of her belongings at the Ertays'

residence.  Ms. Agdipa was aware of another Filipina acquaintance in the area and contacted her

for help.

59.     After Ms. Agdipa escaped, Ms. Ertay contacted her via WhatsApp, a mobile
messaging application, and asked where she had gone.  Ms. Agdipa responded that the threats
that the Ertays had been making and the poor conditions that she had been working under forced
her to leave.  Ms. Ertay's responding messages harassed Ms. Agdipa, accusing her of lying.  Ms.
Ertay's messages were emotionally manipulative and vicious, accusing Ms. Agdipa of
abandoning and failing to care for the Ertays' son by leaving the family's employ, and going so
far as to say that Ms. Agdipa was at fault for crying during difficult workdays.

60.     On May 6, 2021, Ms. Ertay sent several lengthy messages, which stated her
response was informed by her lawyer, that attempted to deny liability for the cruel treatment Ms.
Agdipa experienced.  Ms. Ertay also threatened to throw out the things that Ms. Agdipa had been
forced to leave behind.  Ms. Agdipa ultimately blocked Ms. Ertay's number to prevent further
harassing messages.

61.     Shortly thereafter, Ms. Agdipa was referred to the Labor Attaché for the Embassy
of the Philippines in D.C.  Upon hearing Ms. Agdipa's experience, the Labor Attaché referred
Ms. Agdipa to legal services that would be able to help her remain safe from the Ertays and
begin to rebuild her life.

62.     Ms. Agdipa provided testimony about the abuse and forced labor she experienced
to the United States government.

63.     Ms. Agdipa has suffered financially, psychologically, and emotionally due to the
abuse she suffered from the Ertays.  For well over a year of employment, Ms. Agdipa was
deprived of a lawful minimum wage and contractually-obligated overtime wages.  She suffered
stress and anguish from the wage theft, which left her in a financially vulnerable position and
unable to provide for her family as desired.  The Ertays' abuse of Ms. Agdipa resulted in her

suffering from regular headaches, shaking, anxiety, shortness of breath, chest pain, and tearfulness.

64.     The Ertays remained in the United States as members of the Turkish diplomatic mission until at least September 2023.

## COUNT I
### Violations of the Victims of Trafficking and Violence Protection Reauthorization Act, 18 U.S.C. §§ 1589 & 1590
### (Against all Defendants)

65.     Ms. Agdipa re-alleges and incorporates paragraphs 1 through 64 of this Complaint.

66.     During the course of Ms. Agdipa's employment, the Ertays repeatedly threatened abuse of the law and legal process in order to retain Ms. Agdipa's labor and services, in violation of 18 U.S.C. § 1589.

67.     When Ms. Agdipa tried to raise her concerns with her working conditions and wage theft, the Ertays threatened to have Ms. Agdipa deported from the U.S.  The Ertays also threatened deportation at random times when Mr. or Ms. Ertay was in a foul mood.  The Ertays threatened to withhold Ms. Agdipa's identification and immigration-related documents if she attempted to leave their employ and find other work.  Instead of the fair employment her contract guaranteed, she was held in forced labor, subjected to long hours and harsh working conditions. The Ertays threatened that they would refuse to sign necessary immigration papers and threatened to force Ms. Agdipa to return to the Philippines if she did not comply with their demands.  The Ertays also threatened to call law enforcement on Ms. Agdipa if she attempted to push back on the conditions they imposed.

68.     The Ertays' threats to abuse the law and legal process caused Ms. Agdipa to believe that she would lose her invaluable immigration and identification documents, her ability

to remain and work in the United States, and her ability to support her family.  The Ertays'

threats also caused Ms. Agdipa to believe that she could be forcibly returned to the Philippines

without notice.  Because of Mr. Ertay's high-ranking role as second-in-command in the Turkish

Embassy, Ms. Agdipa believed that the Ertays would be able to make good on their threats to

deport her.

69.     The Ertays knowingly recruited and transported Ms. Agdipa, a citizen of the

Philippines, into the United States for forced labor, in violation of 18 U.S.C. § 1590.  The Ertays'

recruitment and transport of Ms. Agdipa was done with the intent to force Ms. Agdipa to provide

unpaid labor: the Ertays immediately forced Ms. Agdipa to surrender her regular wages, and

refused to compensate Ms. Agdipa for the overtime work that they demanded she undertake.

70.     The Ertays' acts were deliberate, malicious, and should be punished by an award

of punitive damages in an amount to be determined at trial.

## COUNT II
### Willful Violations of the Fair Labor Standards Act, 29 U.S.C. § 206(f)
### (Against all Defendants)

71.     Ms. Agdipa re-alleges and incorporates paragraphs 1 through 70 of this

Complaint.

72.     At all times relevant to this Complaint, the Ertays were employers and Ms.

Agdipa was their employee within the meaning of the FLSA. See 29 U.S.C. § 203.

73.     At all times relevant to this Complaint, the Ertays paid Ms. Agdipa less than the

D.C. minimum wage, in violation of 29 U.S.C. § 218(a).

74.     The Ertays were aware of the D.C. minimum wage when, as part of Ms. Agdipa's

visa application, Ms. Ertay submitted the Contracts to the United States Embassy stating that Ms.

Agdipa would work 35 hours per week and be paid $980 and subsequently $1,050 every two

weeks.  These Contracts explicitly required Ms. Ertay to certify that the hourly wage would be at least the federal or local minimum wage.

75.     For these reasons, the Ertays' failure to pay Ms. Agdipa at least the D.C. minimum wage was in knowing or reckless disregard of the Federal Labor Standards Act's requirements.

**COUNT III**
**Violations of the D.C. Minimum Wage Revision Act §§ 32-1001, et. seq.**
**(Against all Defendants)**

76.     Ms. Agdipa re-alleges and incorporates paragraphs 1 through 75 of this Complaint.

77.     At all times relevant to this Complaint, the Ertays were employers and Ms. Agdipa was their employee within the meaning of the DCMWRA. See D.C. Code § 32-1002.

78.     At all times relevant to this Complaint, the Ertays paid Ms. Agdipa less than the D.C. minimum wage for all hours worked, in violation of D.C. Code § 32-1003(a).

79.     At all times relevant to this Complaint, Ms. Agdipa routinely worked over forty hours a week.  The Ertays failed to pay Ms. Agdipa overtime wages for the hours she worked in excess of forty hours per week, in violation of D.C. Code § 32-1003(c).

80.     The Ertays have not acted in good faith or with reasonable grounds to believe their actions and omissions were not in violation of the DCMWRA, nor did they promptly pay the full amount of wages that Ms. Agdipa is owed.

81.     Ms. Agdipa is entitled to recover all unpaid wages, back wages, statutory penalties, liquidated damages equal to three times the amount of unpaid wages, reasonable attorneys' fees and costs pursuant to D.C. Code § 32-1012 and D.C. Code § 32-1308.

**COUNT IV**
**Violations of the D.C. Wage Payment and Collection Law,**
**D.C. Code §§  32-1301, et. seq.**
**(Against all Defendants)**

82.     Ms. Agdipa re-alleges and incorporates paragraphs 1 through 81 of this Complaint.

83.     At all times relevant to this Complaint, the Ertays were employers and Ms. Agdipa was their employee within the meaning of the DCWPCL. D.C. Code § 32-1002.

84.     At all times relevant to this Complaint, the Ertays paid Ms. Agdipa less than the D.C. minimum wage, in violation of D.C. Code § 32-1003.

85.     At all times relevant to this Complaint, Ms. Agdipa routinely worked over forty hours a week.  The Ertays failed to pay Ms. Agdipa overtime wages for the hours she worked in excess of forty hours per week, in violation of D.C. Code § 32-1003(c).

86.     Ms. Agdipa is entitled to recover all unpaid wages, back wages, statutory penalties, liquidated damages equal to three times the amount of unpaid wages, reasonable attorneys' fees and costs pursuant to D.C. Code § 32-1308.

**COUNT V**
**Common Law Intentional Infliction of Emotional Distress**
**(Against all Defendants)**

87.     Ms. Agdipa re-alleges and incorporates paragraphs 1 through 86 of this Complaint.

88.     The Ertays intentionally and recklessly caused severe emotional distress to Ms. Agdipa by their extreme and outrageous conduct, including repeatedly threatening to deport her, constantly berating and cursing at her, forcing her to work until she fainted, to use cleaning chemicals that burned her eyes and hands, and failing to provide her with regular meals while simultaneously restricting her from regularly cooking her own food.

89.     The Ertays exercised control over every aspect of Ms. Agdipa's life, from her working hours, to her sleep schedule, to the limited food she could eat, to the days and hours when she was permitted outside their house.  As a consequence, Ms. Agdipa was unable to escape the emotional distress that the Ertays' actions caused.

90.     The Ertays' wage theft was further severely emotionally distressing, as it ensured that Ms. Agdipa would not have the means to provide for herself or her family, and caused Ms. Agdipa to feel hopeless, as she worked long hours and weeks with less than minimum wage to show for it.

91.     As a result of the Ertays' actions, Ms. Agdipa suffered severe emotional distress, manifested physically by her insomnia, fainting, tearfulness, headaches, shaking, shortness of breath, and chest pain.

## COUNT VI
## Common Law Fraud
## (Against all Defendants)

92.     Ms. Agdipa re-alleges and incorporates paragraphs 1 through 91 of this Complaint.

93.     The Ertays knowingly made false representations to Ms. Agdipa regarding her future conditions of employment while in the United States, in particular that: (1) Ms. Agdipa's conditions of employment would be fair; (2) her typical working hours would be Monday

through Friday from 11:00 a.m. to 5:00 p.m. and on Saturday from 11:00 a.m. to 4:00 p.m. and (3) she would be appropriately compensated. Upon arrival to the Ertays' home in Washington, D.C., Ms. Agdipa was forced to work from 7:00 a.m. until 9:00 p.m., Monday through Saturday, with no overtime pay. The Ertays promised Ms. Agdipa payments in accordance with D.C. minimum wage every two weeks, but forced her to return portions of her salary to them in cash payments. The amounts the Ertays forced Ms. Agdipa to return are detailed in paragraph 32. The Ertays never paid Ms. Agdipa for the overtime hours that she worked and made threats of deportation on a regular basis.

94. The Ertays made these false representations to Ms. Agdipa with the purpose of inducing Ms. Agdipa to agree to come to the United States and provide free labor for the Ertays' household.

95. Ms. Agdipa reasonably relied on the Ertays' representations and would not have agreed to work for the Ertays in the United States had she known what her true working and living conditions and compensation would be.

96. Ms. Agdipa suffered damage as a direct result of her reliance on the Ertays' statements.

## COUNT VII
### Breach of Contract
### (Against all Defendants)

97. Ms. Agdipa re-alleges and incorporates paragraphs 1 through 96 of this Complaint.

98. Ms. Ertay breached the written contracts she entered into with Ms. Agdipa and submitted to the United States Embassy in order to obtain Ms. Agdipa's A-3 visa.

99.    This breach included Ms. Ertay's failure to pay the promised salary, and failure to provide the benefits and conditions of employment specified in the Contracts.

## COUNT VIII
### Unjust Enrichment
### (Against all Defendants)

100.    Ms. Agdipa re-alleges and incorporates paragraphs 1 through 99 of this complaint.

101.    Ms. Agdipa's work in the Ertay household conferred a benefit upon Mr. and Ms. Ertay.

102.    The Ertays knew of the benefit they received from Ms. Agdipa's work and appreciated that benefit.

103.    The Ertays have not yet paid fair value for Ms. Agdipa's services.

104.    It would be inequitable to allow the Ertays to retain the benefit of Ms. Agdipa's services without paying their fair value.

## PRAYER FOR RELIEF

105.    Wherefore, Ms. Agdipa respectfully prays for entry of a judgment against Defendants, Mr. and Ms. Ertay, for: actual damages in an amount to be proven at trial; punitive damages; reasonable attorneys' fees; and such other and further relief as the Court deems appropriate.

## JURY DEMAND

Ms. Agdipa respectfully requests a trial by jury on all issues so triable as of right pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: May 20, 2024                    Respectfully Submitted,


                                       */s/ Olamide S. Orebamjo*
                                       Olamide S. Orebamjo (Bar No. 1600786)
                                       Melissa L. Patterson (Bar No. D00418)
                                       Elizabeth S. Fassih (Bar No. 1671259)
                                       JONES DAY
                                       51 Louisiana Avenue, N.W.
                                       Washington, D.C.  20001
                                       Telephone:    +1.202.879.3939
                                       Facsimile:     +1.202.626.1700
                                       mpatterson@jonesday.com
                                       efassih@jonesday.com
                                       oorebamjo@jonesday.com

                                       *Attorneys for Plaintiff, Sharon Agdipa*