**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHARON THOMAS AGDIPA,<br><br>Plaintiff,<br><br>v.<br><br>ANIL OZGE ERTAY, HUSNU SINAN ERTAY,<br><br>Defendants. | Civil Action No. 24-1491 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiff Sharon Agdipa brings this action against her former employers, Hüsnü Sinan Ertay and Anil Özge Ertay (the "Ertays"), for violating the Victims of Trafficking and Violence Protection Reauthorization Act, 18 U.S.C. §§ 1589 & 1590 (Count I), the Fair Labor Standards Act, 29 U.S.C. § 206(f) (Count II), the D.C. Minimum Wage Revision Act, D.C. Code §§ 32-1001, *et. seq.* (Count III), the D.C. Wage Payment and Collection Law, D.C. Code §§ 32-1301, *et. seq.* (Count IV), and common law claims for intentional infliction of emotional distress (Count V), fraud (Count VI), breach of contract (Count VII), and unjust enrichment (Count VIII). Compl. at ¶¶ 65-104, ECF No. 1. These claims arise from factual allegations that when defendants employed plaintiff as their live-in housekeeper in Washington, D.C., they trafficked her to the United States, stole her wages, failed to pay her overtime, constantly berated her, and isolated her from obtaining help by threatening to have her deported and forcing her to provide false answers to the U.S. Department of State about her living and working conditions. *Id.* ¶¶ 1-11.

Plaintiff initiated this action on May 20, 2024, three years and fifteen days after leaving defendants' employ on May 5, 2021. Defendants seek dismissal of Counts II–IV and VI–VIII, pursuant to Federal Rule of Civil Procedure 12(b)(6), principally arguing that these claims are

time-barred as beyond the applicable three year statute of limitations. Defendants, in the alternative, also argue that plaintiff's common law fraud and unjust enrichment claims should be dismissed as duplicative of, or precluded by, her breach of contract claim. For reasons explained more fully below, defendants' motion to dismiss is denied without prejudice.

## I. BACKGROUND

The factual background and procedural history of this case are summarized *seriatim*.

### A. Factual Background

The relevant facts as alleged in plaintiff's complaints are as follows. *See Casey v. McDonald's Corp.*, 880 F.3d 564, 567 (D.C. Cir. 2018) ("On a motion to dismiss, we must assume that the allegations of the complaint are true.").

Plaintiff is a citizen of the Philippines. Since at least 1999, plaintiff has worked as a nanny or a caretaker "in various countries," including for a Filipino diplomat's family "for a brief time period in the U.S., during which she experienced reasonable working conditions and hours," Compl. ¶ 18, ECF No. 1, and for a Turkish family in New York City, where she also "experienced good working conditions and reasonable hours," *id.* ¶ 20. After her contract with the Turkish family ended in 2019, plaintiff left the United States and traveled back to the Philippines. *Id.* ¶ 23. While in the Philippines, plaintiff communicated with defendants in late 2019 about a potential job for defendants as a domestic worker. *Id.*

On or around November 22, 2019, defendants formally offered plaintiff a position as a live-in-nanny and housekeeper at their residence in Washington, D.C., *id.* ¶ 25, which plaintiff accepted, *id.* ¶ 27. The employment contract ("Contract") specified that plaintiff was hired to perform childcare, housework, cooking, and other unspecified duties. *Id.* ¶ 26. To perform those services, plaintiff would work thirty-five hours per week, Monday through Saturday, for $14 per

hour, or approximately $1,960 per month. *Id.*[1] If she worked overtime, she would receive $21 per hour. *Id.* The Contract also guaranteed plaintiff, "at a minimum[,] . . . a private bed and access to a bathroom, kitchen facilities, and proper food storage." Ex. A at 4, ECF No. 1-2; *see also* Compl. ¶ 26. After plaintiff signed the Contract, she traveled to Washington, D.C. and started working for defendants on February 5, 2020. *Id.* ¶ 27.

From approximately February 5, 2020 to May 5, 2021—the 15-month period in which plaintiff was in defendants' employ—defendants "forced [plaintiff] to surrender her regular wages, and refused to compensate Ms. Agdipa for the overtime work that they demanded she undertake." *Id.* ¶ 69. Although plaintiff was only contractually obligated to work six hours per day during the week and five hours on Saturday, defendants regularly required her to work at least fifteen hours per day, from approximately 7:00 a.m. to 10:00 p.m. or 11:00pm. *Id.* ¶ 33. While this schedule "routinely" resulted in plaintiff working overtime, defendants only ever paid plaintiff wages for a thirty-five hour work week. *Id.* Moreover, on ten occasions, shortly after defendants had paid plaintiff via mobile payment, they demanded plaintiff give them money back in cash. *Id.* ¶¶ 30, 32. They either drove or instructed plaintiff to go to an ATM, "forced her" to withdraw a specified amount of money, and "forced her" to give the money she withdrew to them. *Id.* ¶ 30, 31. Defendants "promised" to "compensate [plaintiff] for the amount that they forced her to withdraw when [their] son went to school in August," but they never did. *Id.* ¶ 32. In total, plaintiff was required to hand over $9,450, approximately one-third of the total wages she was paid during the fifteen months she worked for the defendants. *Id.* For example, in June 2020, due to the forced

[1] In July 2020, D.C.'s minimum wage was raised from $14 per hour to $15 per hour. To reflect this change, in July 2020, plaintiff and defendants signed a new contract to reflect this raise and to clarify the exact hours each day plaintiff was expected to work to comprise the thirty-five hours per week. Compl., Ex. B, ECF 2-1. The two contracts are otherwise substantively the same. Unless otherwise specified, Contract refers to Exhibit A.

withdrawal of $1,350 from her account, plaintiff's realized income for the month was $610, instead of the contractually obligated minimum of approximately $1,960 per month. *Id.* ¶ 31.

In addition to underpaying plaintiff, defendants also subjected plaintiff "to grievous working conditions and to daily emotional and psychological abuse," which resulted in plaintiff suffering physically, including regular headaches, shaking, anxiety, shortness of breath, chest pain, and tearfulness. *Id.* ¶¶ 40, 63. Defendants "did not fulfill [their] promise," "both informally and in the formal employment contract," to provide plaintiff with a private bedroom. *Id.* ¶ 50. Instead, plaintiff's bed was located in defendants' basement, "which had no lock or other manner of preventing others from entering her space." *Id.* "Mr. Ertay entered Ms. Agdipa's living and sleeping space every single day and several times throughout the day, including at odd hours." *Id.* Mr. Ertay "used the basement as his makeshift closet," and required plaintiff to vacate the basement during early-morning and late-night hours so that he could change and use the basement bathroom, even though other bathrooms were available in the house. *Id.*

Defendants further "failed to provide regular meals" for plaintiff. *Id.* ¶ 44. Plaintiff was "rarely permitted to cook her own food" and there were "days when Ms. Agdipa went without food." *Id.* On those days, she "had to depend on food donations from another family's nanny, which were provided to her on rare occasions." *Id.* Additionally, on days that plaintiff did eat, breakfast would often be "her only full meal for the day," as the working hours the defendants required her to work did not allow plaintiff to take a break for meals. *Id.* ¶ 44. During the afternoons and evenings, when the working hours permitted, plaintiff would eat "instant ramen noodles, inedible rice, and canned goods." *Id.*

Defendants also "failed to provide adequate medical treatment or sick days." *Id.* ¶ 8. Ms. Ertay forced plaintiff to combine certain chemicals and solutions to clean the house, despite

plaintiff "plead[ing] with Ms. Ertay and explain[ing] that the combination of these chemicals would burn her." *Id.* ¶ 41. Defendants "failed to provide her with any medical treatment," and as a result, plaintiff suffered burns to her hands and eyes and scarring on one of her hands. *Id.* ¶¶ 41, 46. Further, "[e]ven though the Contract provided [plaintiff] with sick leave," defendants forced plaintiff to work when she was "visibly ill," including once, when after she fainted and hit her head, she was forced to resume work after "coming to." *Id.* ¶¶ 47-48. When plaintiff wanted to get the COVID-19 vaccine, defendants "did not permit her to go" and "berated her for requesting the minimal time away required to take the vaccination." *Id.* ¶ 45. When defendants "finally agreed to take her to the clinic to receive the vaccination, they left her at the clinic rather than waiting as agreed to take her home," and plaintiff "was forced to walk two hours back to [defendants'] home." *Id.* Defendants "calculated [plaintiff's] estimated walk time, and required her to confirm that she had returned to their home and had started on her tasks exactly two hours after she left the clinic." *Id.*

Further, although plaintiff "received Sunday off," "she was typically confined to the Ertays' house and unable to make use of her time off." *Id.* ¶ 49. Defendants "refused to give [plaintiff] a key to their home and did not permit her to leave the door unlocked." *Id.* "[I]f Ms. Agdipa left the home, she would have faced consequences from the Ertays for leaving the door unlocked," and "if someone was home to lock the door behind her, Ms. Agdipa had no guarantee that she would be able to get back into the house at a specific time and would have to risk being stranded outside without her belongings." *Id.*

As a part of "a program prompted by significant abuse of . . . domestic workers [employed by diplomats] in the past," the State Department Office of Foreign Missions ("OFM") made two "standard" check-in calls to defendants' home to speak with plaintiff and ensure the terms of her

employment contract were being met. *Id.* ¶¶ 36, 39. The first call occurred "shortly after" plaintiff began working for defendants; the second call occurred sometime after July 2020. *Id.* ¶¶ 36, 39. During these calls, defendants "stood near [plaintiff] so that they could hear OFM's questions," and "instructed [plaintiff] to tell OFM that she would receive the salary and payment terms agreed to in the Contract." *Id.* ¶¶ 36, 39. Mr. Ertay also "instructed [plaintiff] to inform OFM that she had her own private bedroom with a window." *Id.* ¶ 51. Defendants "forbade [plaintiff] from providing information to OFM outside of what they had instructed her to say." *Id.* ¶ 36.

When plaintiff tried to raise concerns with defendants about her working conditions and wage theft, and raised seeking new employment, defendants responded with threats to withhold her identification and immigration-related documents, to deport her, and to initiate law enforcement action against her. *Id.* ¶¶ 54, 67. Defendants verbally harassed and berated plaintiff, "threatening to throw her out on the streets or send her back to the Philippines." *Id.* ¶ 42. Defendants' threats caused plaintiff to "believe that she would lose her invaluable immigration and identification documents, her ability to remain and work in the United States, and her ability to support her family." *Id.* ¶ 68. Defendants also sought to isolate plaintiff, yelling at her if they saw her talking with others, especially Filipina nannies. *Id.* ¶ 52. On May 5, 2021, Ms. Ertay saw plaintiff speaking with another nanny at a park and "scream[ed] at and berat[ed]" plaintiff, "accusing her of failing at her job duties and failing to take care" of their son. *Id.* ¶ 56. That evening, after the abusive behavior had continued and escalated throughout the day, plaintiff fled the abuse, leaving most of her belongings at defendants' house. *Id.* ¶¶ 57-58.

Shortly thereafter, on a date not specified in the complaint, plaintiff spoke with the Labor Attaché for the Embassy of the Philippines in D.C., who referred her to legal services. *Id.* ¶ 61. After that, on another unspecified date, plaintiff "provided testimony about the abuse and forced

labor she experienced to the United States government." *Id.* ¶ 62. Defendants remained in the United States as members of the Turkish diplomatic mission until at least September 2023. *Id.* ¶ 64.

### B. Procedural Background

On May 20, 2024, plaintiff initiated this action seeking damages against the Ertays, alleging violations of the Victims of Trafficking and Violence Protection Reauthorization Act, 18 U.S.C. §§ 1589 & 1590 (Count I), the Fair Labor Standards Act, 29 U.S.C. § 206(f) (Count II), the D.C. Minimum Wage Revision Act, D.C. Code §§ 32-1001, *et. seq.* (Count III), the D.C. Wage Payment and Collection Law, D.C. Code §§ 32-1301, *et. seq.* (Count IV), and common law claims for intentional infliction of emotional distress (Count V), fraud (Count VI), breach of contract (Count VII), and unjust enrichment (Count VIII). *See* Compl. at 18-24.

Defendants have moved to dismiss six of the eight counts, namely, Counts II–IV and VI–VIII, which allege claims under federal and D.C. wage laws and common law fraud, breach of contract, and unjust enrichment, respectively, *see* Defs.' Mot. Dismiss, ECF No. 18; Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 1-2, ECF No. 18-1, leaving unchallenged only Counts I and V, asserting claims under the Victims of Trafficking and Violence Protection Reauthorization Act and common-law intentional infliction of emotional distress, respectively. Defendants' motion is ripe for review. *See* Pl.'s Mem. Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n"), ECF No. 21; Defs.' Reply Mem. Supp. Mot. Dismiss ("Defs.' Reply"), ECF No. 22.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads factual content that "allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When considering a Rule 12(b)(6) motion, a court must "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the [plaintiff's] favor." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). A court may also consider "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citation and alteration omitted). Factual disputes, however, generally cannot be resolved on a motion to dismiss, as a court's "role is not to speculate about which factual allegations are likely to be proved after discovery." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015).

"At the motion to dismiss stage under Rule 12(b)(6) of the Federal Rules of Civil Procedure, 'dismissal is appropriate on statute of limitations grounds 'only if the complaint on its face is conclusively time-barred.'" *Page v. Comey*, 137 F.4th 806, 813 (D.C. Cir. 2025) (quoting *Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*, 922 F.3d 459, 464 (D.C. Cir. 2019)). This "face-of-the-complaint principle," *id.*, means that "courts should hesitate to dismiss a complaint on statute of limitations grounds" based solely on the pleadings because "statute of limitations issues often depend on contested questions of fact." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). *See also Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014) ("Because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." (alteration omitted) (quoting *de Csepel v. Republic of Hungary*, 714 F.3d 591, 603 (D.C. Cir. 2013)).

## III. DISCUSSION

Defendants seek dismissal of Counts II–IV, which allege unpaid wages under federal and D.C. wage laws, and Counts VI–VIII, which allege fraud, breach of contract, and unjust enrichment under common law, on statute-of-limitations grounds. Defs.' Mem. at 5-18. For the common law claims, defendants additionally argue, in the alternative, that the fraud claim should be dismissed as duplicative of the breach of contract claim and that the unjust enrichment claim is precluded by the existence of a valid contract. *Id.* at 14-15, 16-17. Defendants' arguments for dismissal of plaintiff's wage payment claims (Counts II–IV) will be discussed first, followed by defendants' arguments for dismissal of plaintiff's common law claims (Counts VI–VIII).

None of these claims is clearly time-barred on the face of the complaint because plaintiff has established that tolling may be warranted, and thus dismissal on statute-of-limitations grounds is inappropriate at this early stage. Nor are the fraud and unjust enrichment claims (Counts VI & VIII) duplicative of or precluded by plaintiff's breach of contract claim (Count VII). Consequently, for the reasons explained more fully below, defendants' motion to dismiss is denied, without prejudice, pending discovery regarding relevant factual matters.

### A. Plaintiff's Wage Payment Claims (Counts II–IV).

Defendants' sole argument for dismissal of plaintiff's federal and D.C. wage law claims is that those claims were filed more than three years after the claim accrued and are thus time-barred. Defs.' Mem. at 5-11. A three-year statute of limitations generally applies to both FLSA and D.C. Wage Payment Act ("WPA") claims. *See Galloway v. Chugach Gov't Servs., Inc.*, 263 F. Supp. 3d 151, 158 n.2 (D.D.C. 2017) ("Pending a post-discovery determination as to whether the alleged FLSA violation here was 'willful,' which extends the limitations period under the FLSA from two to three years, the parties should assume a three-year statute of limitations to avoid prejudicing any potential plaintiffs."); D.C. Code § 32–1308(c)(1) (providing, with certain exceptions, that

WPA claims "must be commenced within 3 years after the cause of action accrued, or of the last occurrence if the violation is continuous, or the cause of action shall be forever barred").

Plaintiff filed her complaint on May 20, 2024, three years and fifteen days after she left defendants' employ on May 5, 2021. Plaintiff does not contest the assumption of a three-year statute of limitations for her claims at the motion to dismiss stage, nor that she filed the complaint more than three years after her unpaid-wages injuries. Rather, plaintiff argues that her complaint was nevertheless timely filed under the equitable tolling doctrine, raising substantively similar but not identical arguments for her federal and D.C. wage law claims, which are addressed in turn below.

***1. Fair Labor Standards Act Claim (Count II)***

Plaintiff contends that her FLSA claim is timely filed because equitable tolling is warranted for two reasons: (1) defendants' diplomatic immunity precluded plaintiff from filing suit until 2023, when defendants left their diplomat positions in the United States, or, in the alternative, (2) defendants' conduct prevented or impeded plaintiff from filing suit within the normal three-year statute of limitations. Following a brief overview of the equitable tolling doctrine, each argument for tolling is discussed.

***a. Equitable Tolling Generally***

"As a general matter, equitable tolling pauses the running of, or tolls, a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014) (internal quotation marks omitted). Extraordinary circumstances are circumstances beyond the control of the complainant that make it impossible to file a complaint within the statute of limitations, *United States v. Cicero*, 214 F.3d 199, 203 (D.C. Cir. 2000), including, for example, "where the complainant has been induced . . . by his adversary's misconduct into allowing the filing deadline

to pass," *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990). When assessing whether the plaintiff has been induced by defendant's misconduct, "the relevant question for tolling is the effect . . . of the entire exchange between employer and employee." *Ayala v. Tito Contractors, Inc.*, 82 F. Supp. 3d 279, 291 (D.D.C. 2015) (highlighting that failure to post notice of rights under the FLSA, in conjunction with other active misrepresentations, or when combined with the employees' limited education, may compel equitable tolling).

"The party arguing for equitable tolling bears the burden of demonstrating entitlement to it," *Young v. SEC*, 956 F.3d 650, 655 (D.C. Cir. 2020), by showing that (1) "'he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing," *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). "Application of equitable tolling is solely within the Court's discretion," *Smith v. Holder*, 806 F. Supp. 2d 59, 63 (D.D.C. 2011) (BAH) (citing *Fortune v Holder*, 767 F. Supp. 2d 116, 119-21 (D.D.C. 2011) (BAH)), mindful of the Supreme Court's admonition that equitable tolling is to be applied only "sparingly," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

***b. Equitable tolling based on diplomatic immunity***

Plaintiff argues that the period between when her FLSA claims accrued and September 2023, the last known month when defendants were employed by the Embassy of Turkey in Washington, D.C., should be equitably tolled. Since diplomatic immunity precluded filing suit against defendants before September 2023, plaintiff explains that she was "legally prevented" from suing defendants. Pl. Opp'n at 2, 7-8; *see also* Compl. ¶¶ 4, 10. Plaintiff is mistaken.

Diplomatic immunity is not a legal prohibition against suing a diplomat while serving in a diplomatic post, but rather a jurisdictional defense that may be raised by the diplomat or the diplomat's sending state once a case has already been filed, with applicability of this defense to be

determined by a court. *See Zuza v. Off. of the High Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017) ("[D]iplomatic immunity . . . serves as a defense to suits *already commenced*." (emphasis added) (quoting *Abdulaziz v. Metro. Dade Cty.*, 741 F.2d 1328, 1329–30 (11th Cir. 1984))). Indeed, the Diplomatic Relations Act, 22 U.S.C. § 254d, which governs diplomatic immunity under United States law, expressly provides that "'action[s] or proceeding[s] brought against . . . individuals[s] . . . *entitled to immunity with respect to such [an] action or proceeding* . . . shall be dismissed," and that "[s]uch immunity *may be established* upon motion or suggestion . . . or as otherwise permitted by law or applicable rules of procedure." 22 U.S.C. § 254d (emphasis added). This plain text "contemplates both that there are 'actions or proceedings' in which certified diplomats may not be 'entitled' to immunity, and that judicial proceedings will be necessary to 'establish' whether they are or not." *United States v. Deaver*, No. 87-cr-096, 1987 WL 13365, at *1 (D.D.C. Jun. 22, 1987); *see also Knab v. Republic of Georgia*, No. 97-cv-3118, 1998 WL 34067108, at *2 (D.D.C. May 29, 1998) ("Defendant argues that the Court must dismiss the claims against him because he enjoys diplomatic immunity from civil suit. . . . [T]he Court must determine whether defendant [] enjoys civil immunity for his actions.").

Plaintiff resists this reading of the Diplomatic Relations Act, contending that "[it] makes no sense . . . to file suit while Defendants were entitled to diplomatic immunity, only to have the suit dismissed." Pl.'s Opp'n at 8. Yet plaintiff could not have known without actually filing suit whether the diplomatic immunity defense would have been asserted by defendants or Turkey, either of whom "may" but is not required invoke such immunity. 22 U.S.C. § 254d; *see also Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 683 F. Supp. 2d 1, 11 (D.D.C. 2010) (noting that "diplomatic immunity, like sovereign immunity, can be waived," such as "where a diplomat makes an untimely assertion of immunity" (collecting cases)); *Mazengo v. Mzengi*, No. 07-cv-756,

2007 WL 8026882 at *2 n.2 (D.D.C. Dec. 20, 2007) ("Even if [defendant] would also be immune from the civil jurisdiction of the United States because she is the wife of a diplomat, she has not appeared in this litigation to assert such immunity. . . . [Defendant] has not raised diplomatic immunity as a defense and therefore it is not an issue before the undersigned or the trial court."). Nor could plaintiff have known whether a reviewing court would have found that diplomatic immunity applied. *See Mazengo*, 2007 WL 8026882, at *2 n.2 (stating that "diplomatic immunity is not absolute," and, of relevance in that case, noting that "Article 31(c) [of the Vienna Convention on Diplomatic Relations, to which the United States is a party] provides that a diplomatic agent does not enjoy immunity from civil jurisdiction in [a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving state outside his official functions" (internal quotation marks omitted)). In short, the fact that defendants may have asserted diplomatic immunity, regardless of how likely, does not relieve plaintiff of her burden to timely file her action.

Plaintiff's reliance on *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187 (D.D.C. 2007), *see* Pl.'s Opp'n at 8, is misplaced since that case actually demonstrates why equitable tolling based on diplomatic immunity is inapplicable here. *Gonzalez Paredes* involved similar claims under federal and D.C. wage laws brought by a former live-in domestic employee against a diplomat but, unlike the instant case, the plaintiff had filed her complaint before the statute of limitations had run, and the defendant diplomat successfully asserted diplomatic immunity. *Id.* at 189. Although the case was, consequently, dismissed without prejudice, the court suggested, in a footnote, that plaintiff could file suit again in the future when "defendants are not immune," and that "the statute of limitations on plaintiff's claim be tolled until such time." *Id.* at 189 n.2. In contrast to *Gonzalez Paredes*, plaintiff never filed a timely action and thus has not carried her burden for equitable

tolling to establish that the diplomatic immunity defense would have precluded her suit. Merely speculating about the likelihood of defendants or Turkey invoking diplomatic immunity successfully, as plaintiff does here, falls short of an actual invocation of diplomatic immunity as occurred in *Gonzalez Paredes*.

Plaintiff's argument that defendants' diplomatic immunity compels equitable tolling is thus unpersuasive.

***c. Equitable Tolling Based On Defendants' Improper Conduct***

Plaintiff next argues that equitably tolling of the statute of limitations applies here because defendants' conduct prevented or impeded plaintiff from filing suit within the three-year statute of limitations. Pl.'s Opp'n at 8-12. As support, plaintiff alleges that defendants did not comply with FLSA rules requiring them to post information about employee rights, *id.* at 9, and that defendants' actions in threatening and isolating her left her confused and ignorant of her employee rights, *id.* at 11. These allegations suffice to show that equitable tolling may be warranted, and thus dismissal of Count II at this juncture would not be appropriate. *See, e.g.*, *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 118 (D.D.C. 2012) (RCL) (denying dismissal of otherwise untimely wage and common-law claims brought by foreign live-in domestic worker against former employers due to possible tolling based on allegations that employers denied plaintiff information about workers' rights and threatened plaintiff from seeking legal help); *Cruz v. Maypa* 773 F.3d 138, 147 (4th Cir. 2014) (similar); *Lama v. Malik*, 58 F. Supp. 3d 226, 235 (E.D.N.Y. 2014) (similar); *Franco v. Diaz*, 51 F. Supp. 3d 235, 248 (E.D.N.Y. 2014) (similar); *Deressa v. Gobena*, No. 05-cv-1334, 2006 WL 335629, at *1, *3 (E.D. Va. Feb. 13, 2006) (similar).

Critically, where some period of equitable tolling may be warranted because the employer prevented the employee from learning of her legal rights, a key determinant of the length of equitable tolling is when the employee obtained actual knowledge of her rights. In *Kiwanuka*, for

example, the plaintiff "travel[ed] from Tanzania to the United States to work as a domestic servant" for the defendants, one of whom worked at the World Bank. 844 F. Supp. 2d at 111. The plaintiff filed suit against her employers after the statute of limitations had run, alleging they "purposefully mis-translat[ed] and withh[eld] critical information regarding domestic workers' legal rights," refused to pay her promised wages and misrepresented her rights to her bank account, confiscated her passport, and threatened her with deportation. *Id.* at 118. The plaintiff was eventually connected with the Federal Bureau of Investigation ("FBI"), which had responded to a tip of possible human trafficking. *Id.* at 111. The court found that, taken as a whole, "these allegations [were] sufficient to establish a claim of equitable tolling" of the plaintiff's FLSA claim because she was "controlled and manipulated by the defendants' actions" and the defendants had taken affirmative steps to prevent her from "initiating legal proceedings to vindicate her rights." *Id.* The court tolled the statute of limitations until the plaintiff's first contact with the FBI, on a specific date alleged in the complaint, which the court found was when the plaintiff was free from the defendants' control and learned of her legal rights. *Id.* at 120; *see also Lama v. Malik*, 58 F. Supp. 3d 226, 233-35 (E.D.N.Y. 2014) (stating, where a former live-in domestic employee alleged that employers isolated her, retained her immigration documents, and did not educate her as to her rights, that "[t]he question . . . is whether Plaintiff's claims should be equitably tolled until she learned of her rights in July 2012 [as alleged in her complaint] when she first met with a lawyer," and, finding the record not sufficiently developed, denying defendants' motion to dismiss without prejudice to renew following discovery or at the time of trial).

Importantly, when, as here, a plaintiff fails to allege in the complaint when she first learned of her rights but still claims entitlement to equitable tolling, dismissal on statute of limitations grounds has been held inappropriate since the complaint is not conclusively time-barred on its

face. In *Cruz*, for instance, the plaintiff—a citizen of the Philippines who came to the United States to work as a live-in domestic employee—filed an untimely suit alleging that her former employers underpaid her and subjected her to problematic working and living conditions. 773 F.3d at 141-42. Although the district court denied equitable tolling of her FLSA claim, the Fourth Circuit reversed that determination, finding some length of tolling appropriate because the plaintiff had alleged that "the defendants confiscated her passport, isolated her from other people, monitored her communications, and threatened that she would be imprisoned and deported if she tried to escape"—all of which "prevented her from seeking legal redress." *Id.* at 146. The Fourth Circuit further held that equitable tolling should continue until the plaintiff obtained actual knowledge of her rights, which could have been gained when the plaintiff first retained an attorney or through a posted notice explaining her rights under the FLSA as required by law. *Id.* at 147. Since the "current record . . . d[id] not identify when [the plaintiff] first retained a lawyer or learned of her rights under the FLSA," the Fourth Circuit reversed the dismissal of the case and directed the district court to "allow discovery on remand to determine in the first instance whether [the plaintiff's] FLSA claim was time-barred despite being equitably tolled." *Id.*

Similarly, in *Dave*, the court found that equitable tolling may apply because the plaintiff, a former live-in domestic employee, had alleged that her employers failed to inform her of her rights, "isolated [her] from the outside world," "monitored her calls and texts on the phone," "maintained control of [her] passport and personal documents," and "threatened to deport [her] thereby separating her from her son." *Dave v. Raval*, No. 24-cv-2616, 2025 WL 1865780, at *1, *5 (D. Md. Jul. 7, 2025). Noting that "[p]laintiff [did] not allege when she retained counsel or otherwise learned of her rights under the FLSA," the court reasoned that "[s]tatute of limitations defenses are the defendant's, not the plaintiff's, burden to plead," and therefore concluded that because "on

the face of the complaint, it [was] not clear that Plaintiff's claims are time-barred," "dismissal on such grounds [was] inappropriate at this juncture." *Id.* at *5.

As in *Kiwanuka*, *Cruz*, and *Dave*, plaintiff has alleged sufficient facts to establish, at this juncture, that some length of equitable tolling may be warranted. Plaintiff is a foreign citizen who was employed as a live-in domestic employee. Compl. ¶ 1. According to plaintiff, defendants used her immigration status to their advantage, threatening "to withhold [her] immigration documents, have her deported, or call law enforcement on her if . . . she complained about her working conditions or if she tried to leave." *Id.* ¶ 8. As in *Kiwanuka* and *Cruz*, plaintiff was allegedly kept in isolation and "prevented . . . from making new friends or acquaintances" who might have helped her. *See id.* ¶¶ 36, 39, 52, 56. Defendants also allegedly monitored plaintiff's calls and directed her responses both times the State Department phoned to check in on her. *See id.* ¶¶ 36, 39, 51. Defendants further allegedly failed to "post[] a notice explaining the [FLSA] . . . in conspicuous places," as required by the FLSA. Pl.'s Opp'n at 9 (quoting 29 C.F.R. § 516.4).[2] In sum, the "entire exchange between employer and employee" may compel some period of equitable tolling. *Ayala*, 82 F. Supp. 3d at 291.

Whether plaintiff's complaint is time-barred notwithstanding equitable tolling is not obvious from the face of her complaint, which does not specify when exactly she retained an attorney or otherwise received notice of her rights. The complaint simply states that "shortly" after May 6, 2021, the day after plaintiff left defendants' employ and the date of plaintiff's last communication with defendants, plaintiff was "referred to the Labor Attaché for the Embassy of

---

[2] Defendants unpersuasively contend that plaintiff's lack-of-notice allegation is "not found anywhere in her Complaint" and should not be considered. Defs.' Reply at 10. To be sure, the complaint does not explicitly state that defendants failed to provide notice of employees' rights, but, as plaintiff points out, this circumstance "is a fair inference from other allegations," including that defendants "exploited Ms. Agdipa's . . . lack of knowledge about U.S. labor laws to manipulate her and control her," Pl.'s Opp'n at 10 n.2 (second quotation quoting Compl. ¶ 34), and "forb[ade] her from talking with officials who could advise her of her rights, *id.* (citing Compl. ¶ 39).

the Philippines in D.C.," who in turn referred plaintiff to "legal services." Compl. ¶ 61. Plaintiff also alleges that, at some point on a date unspecified, she "provided testimony . . . to the United States government" about her experience working for the defendants. *Id.* ¶ 62. To put this concretely, if, *before* May 20, 2021, plaintiff met with counsel or otherwise learned of her rights when she spoke to employees from the Labor Attaché for the Embassy of the Philippines or the U.S. government, then plaintiff's complaint filed on May 20, 2024, notwithstanding equitable tolling, would still be time-barred as exceeding the three-year statute of limitations. Instead, if plaintiff first learned of her rights *on or after* May 20, 2021, then plaintiff's FLSA claim may not be time-barred upon a sufficient showing that more time was needed to file the action. *See Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993) (noting that even where a plaintiff meets the burden of establishing circumstances justifying equitable tolling, the plaintiff is given "extra time *only* if he needs it" (emphasis in original)).

In sum, dismissal of a claim on statute of limitation grounds "is appropriate only if the complaint on its face is conclusively time-barred." *Bregman*, 747 F.3d at 875 (quoting *de Csepel*, 714 F.3d at 603). That test has not been met here. Plaintiff's alleged facts suggest that defendants failed to inform her of her rights and took actions to prevent her from seeking help, which are circumstances that typically warrant equitable tolling. The length of tolling in turn depends on when plaintiff learned of her legal rights, which is not clear from the current record, and which renders dismissal inappropriate at this early stage. Accordingly, defendants' motion to dismiss Count II is denied without prejudice and this case may proceed to discovery, as defendants request, *see* Defs.' Reply at 11 n.9.

***2. D.C. Minimum Wage Act and D.C. Wage Payment Law Claims (Counts III–IV)***

Defendants also seek dismissal on statute of limitations grounds of the D.C. wage law claims in Counts III and IV, for failure to pay minimum wages, in violation of the D.C. Minimum

Wage Revision Act, 32 D.C. Code § 1001 *et seq.*, and for failure to pay overtime, in violation of the D.C. Wage Payment and Collection Law, 32 D.C. Code § 1301 *et seq.*, respectively. Defs.' Mem. at 10-11. Plaintiff counters that the three-year statute of limitations provided under D.C. Code § 32-1308(c)(1), should be tolled for three independent reasons: (1) D.C. Code § 12-304 tolls the limitations period while defendants had diplomatic immunity; (2) D.C. Code § 32-1308(c)(2) tolls the limitations period because defendants allegedly failed to post a notice of employees' rights; and (3) the same tolling principles applicable to the FLSA claim also apply to her D.C. wage claims under D.C. law's "lulling" doctrine. Each of these reasons is examined and the latter two reasons are found to be sufficient to deny, without prejudice, defendants' motion to dismiss Counts III and IV.

***a. Tolling under D.C. Code § 12-304***

Plaintiff argues that D.C. Code § 12-304 tolls the statute of limitations while defendants had diplomatic immunity. Pl.'s Opp'n at 13. This statutory provision tolls the statute of limitations "[w]hen the bringing of an action is stayed . . . by statutory prohibition." D.C. Code § 12-304. As with her FLSA claim, plaintiff contends that tolling is warranted because defendants' diplomatic immunity, under the Diplomatic Relations Act, 22 U.S.C. § 254d, qualifies as a "statutory prohibition" legally prohibiting plaintiff from filing suit against defendants until their departure from the United States in 2023. Pl.'s Opp'n at 13.

For the same reasons that diplomatic immunity did not, contrary to plaintiff's position, prevent her from timely filing her FLSA claim, *see supra* Part III.A.1(b), this argument is unpersuasive as to her D.C. wage law claims. To reprise, the Diplomatic Relations Act is not a statutory *prohibition* on filing lawsuits against foreign diplomats but rather "[d]iplomatic immunity . . . serves as a *defense* to suits *already commenced*." *Zuza*, 857 F.3d at 938 (emphasis added) (citation omitted). "Diplomatic immunity is not absolute" but may be waived or found to

be inapplicable by a court. *Mazengo*, 2007 WL 8026882, at *2 n.2 (finding both waiver and likely inapplicability of diplomatic immunity for a diplomat's wife, who "ha[d] not raised diplomatic immunity as a defense" and in any event had engaged in actions "not part of the official functions for which the government of Tanzania sent [the diplomat] to this county"). Whatever the likelihood of success may have been, plaintiff was not statutorily prohibited by 22 U.S.C. § 254d from initiating a timely action against defendants. Thus, for the same reasons that defendants' diplomatic immunity did not toll plaintiff's FLSA claim, defendants' diplomatic immunity does not amount to a statutory bar to filing a timely lawsuit, under D.C. Code § 12-304, and thus does not toll her D.C. wage law claims.

***b. Tolling under D.C. Code § 32-1308(c)(2)***

Turning to another section of the D.C. Code, plaintiff argues that D.C. Code § 32-1308(c)(2) tolls the limitations period because defendants failed to post or provide the required notice of her rights under D.C. wage laws. This D.C. Code provision provides, *inter alia*, that claims under the D.C. Minimum Wage Revision Act and the D.C. Wage Payment and Collection Law "must be commenced within 3 years after the cause of action accrued, or of the last occurrence if the violation is continuous," *id.* § 32-1308(c)(1), but that "[t]his period is tolled . . . [d]uring any period that the employer fails to provide the complainant with actual or constructive notice of the employee's rights," *id.* § 32-1308(c)(2)(B).

Plaintiff correctly asserts that tolling is statutorily required if defendants failed to "post notice of her rights, or even inform her of those rights verbally," Pl.'s Opp'n at 21, as evidenced by her allegations that defendants "exploited [her] . . . lack of knowledge about U.S. labor laws to manipulate her and control her," *id.* at 10 n.2 (quoting Compl. ¶ 34), and forbade her from talking with officials who could advise her of her rights, *id.* (citing Compl. ¶ 39). *See Wilson v. On the Rise Enters., LLC*, 305 F. Supp. 3d 5, 17-18 (D.D.C. 2018) (BAH) (holding, for claims for

minimum and overtime wages under the D.C. WPA, that "defendants' conduct tolled the statute of limitations under the WPA . . . by 'failing to provide the plaintiff with actual or constructive notice of her rights'" (alterations accepted) (quoting D.C. Code § 32-1308(c)(2)(B))).

Similarly to the limits on tolling the statute of limitations on plaintiff's FLSA claim, *see supra* III.A.1, the statute of limitations on plaintiff's D.C. wage law claims are only tolled until the date that plaintiff learned of her rights. *Accord Cruz*, 773 F.3d at 146-47 (holding that "tolling based on lack of notice [of FLSA rights] continues until the claimant retains an attorney or obtains actual notice of her rights"); *Kephart v. Inst. of Gas Tech.*, 581 F.2d 1287, 1289 (7th Cir. 1978) (holding that tolling may be appropriate when an "employer[] fail[s] to post conspicuously notice of [Age Discrimination in Employment Act ('ADEA')] rights" and that tolling ends "when the employee either retains an attorney or acquires actual knowledge of his rights under the ADEA"); *Reilly v. Upper Darby Twp.*, No. 2:09-cv-2465, 2010 WL 55296, at *3 (E.D. Pa. Jan. 6, 2010) ("[A]n employer's failure to post the required [Americans with Disabilities Act] notices in 'conspicuous places' tolls the limitations period, at least until such time as the aggrieved person seeks out an attorney or acquires knowledge of his rights to be free from discrimination."). Otherwise, as defendants contend, the result would be "a perpetual toll" and that would make little sense, particularly here when "it would have been futile for the Ertays to post a notice of employee rights after Plaintiff's employment ended on May 5, 2021," and "Plaintiff admits that she blocked the Ertays' phone numbers on May 6, 2021 (Compl. ¶ 60), making it impossible for the Ertays to contact her and cutting off the Ertays' only method of providing her with notice." Defs.' Reply at 16.

In sum, whether plaintiff's D.C. wage law claims are timely filed with tolling under D.C. Code § 32-1308(c)(2) will depend on the timing of when plaintiff learned of her rights—a fact not

specified in the current record and for which discovery is necessary. Defendant's motion to dismiss Counts III and IV is, accordingly, also denied without prejudice.[3]

**B. Plaintiff's Common Law Claims (Counts VI-VIII)**

Defendants argue that plaintiff's common law fraud (Count VI), breach of contract (Count VII), and unjust enrichment (Count VIII) claims are time-barred because they were filed over three years after accrual of these causes of action. Def.'s Mem. at 11-18. In the alternative, defendants contend that the claims for fraud and unjust enrichment should be dismissed as duplicative of, or precluded by, the breach of contract claim. *Id.* at 14-15, 16-17. For the reasons discussed below, none of these arguments are persuasive and defendants' motion to dismiss is also denied as to Counts VI–VIII.

***1. Tolling under the "lulling" doctrine***

The District of Columbia "does not recognize an equitable tolling exception to the statute of limitations," *Johnson v. Marcheta Invs. Ltd. P'ship*, 711 A.2d 109, 112 (D.C. 1998), and so plaintiff instead argues that her common law claims should be tolled under the District of Columbia's "lulling" doctrine, raising substantively similar arguments as those advanced for her FLSA and D.C. wage law claims. Pl.'s Opp'n at 15. For all the reasons discussed above, plaintiff has established at this juncture that her common law claims are not conclusively time-barred.

District of Columbia courts generally apply statutes of limitations "strict[ly]." *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998). That said, the D.C. Court of Appeals has recognized at least two "limited exceptions," *id.* at 156-57: (1) the "lulling doctrine," by which "affirmative acts employed by a party to fraudulently conceal either the

[3] Since defendants' motion to dismiss Counts III and IV is denied, plaintiff's alternative argument that tolling of the D.C. wage law claims is also warranted under the "lulling doctrine" need not be reached.

existence of a claim or facts forming the basis of a cause of action toll the running of limitations periods," *Daniels v. Potomac Elec. Power Co.*, 100 A.3d 139, 142 (D.C. 2014) (citations omitted), and (2) the "discovery rule," which "prevent[s] the accrual of a cause of action before an individual can reasonably be expected to discover that he has a basis for legal redress," *East*, 718 A.2d at 157 (citation omitted). As a result, while D.C. law "does not recognize an equitable tolling exception to the statute of limitations," *Johnson*, 711 A.2d at 112, the lulling doctrine and discovery rule exceptions, as applied in this case, "are similar in substance to the equitable tolling doctrine under the FLSA." *Wilson*, 305 F. Supp. at 13 n.3.

Of the two exceptions, plaintiff relies only on the "lulling" doctrine. Under the "lulling" doctrine, "a defendant cannot assert the bar of the statute of limitations, if it appears the defendant has done anything that would tend to lull the plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run." *East*, 718 A.2d at 156-57 (internal quotation marks omitted, alteration accepted). Relevant here, "[D.C.] case law requires some affirmative action on the defendant's part that goes beyond failure to post notice of the law," *id.* at 157, as "'mere silence, failure to disclose, or ignorance of facts establishing a claim' generally do not rise to the level of affirmative misconduct," *id.* (quoting *William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C. 1980)). Rather, for this doctrine to apply, "[t]he defendant must have done something that amounted to an affirmative inducement to plaintiffs to delay bringing action." *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986) (quoting *Hornblower v. George Wash. Univ.*, 31 App. D.C. 64, 75 (1908)).

For example, in *Kiwanuka*, discussed above with respect to the FLSA claim, *see supra* Part III.A.1(c), the plaintiff, a live-in domestic employee, plausibly pled that her employers "lulled her into inaction with respect to bringing her state law claims" for unjust enrichment, tort, and breach

of contract, with allegations that the defendants acted by "exploiting her limited knowledge of English, misleading her about her rights under state and federal law, and perpetrating a scheme involving multiple bank accounts to confuse her as to her actual pay," as well as by taking "affirmative steps to prevent [the plaintiff] from initiating legal proceedings to vindicate her rights[,] including confiscating her identity documents and passport and keeping her in isolation." 844 F. Supp. 2d at 119-20. Not only did these allegations suffice for plausible equitable tolling of the FLSA claim, the alleged facts were also "sufficient[]" under the lulling doctrine to toll the D.C. law claims until the plaintiff "was free from the defendants' control and . . . first contact[ed] . . . the FBI." *Id.* at 120.

Likewise, here, plaintiff's allegations sufficiently support her assertion that defendants lulled her into inaction with respect to bringing her D.C. wage law claims. Plaintiff has alleged that defendants exploited her immigration status and lack of knowledge about U.S. labor laws, threatening that they could "withhold [her] immigration documents, have her deported, or call law enforcement on her" if she "complained about her working conditions." Compl. ¶ 8. According to plaintiff, defendants also monitored her calls with the State Department, *id.* ¶¶ 36, 39, 51, and "prevented [her] from making new friends or acquaintances in D.C.," *id.* ¶ 52, all of which "created an environment of isolation and constant surveillance" that reinforced plaintiff's belief "that she could not seek help from law enforcement or other legal relief without risking deportation or other ramifications," *id.* ¶ 53. These alleged actions, viewed together, suffice to establish that defendants "actively misled Plaintiff as to her rights, affirmatively leading her to believe that she had no recourse" and lulling her into inaction. Pl.'s Opp'n at 21.

As with plaintiff's FLSA and D.C. wage law claims, *see supra* III.A.1, plaintiff has alleged sufficient facts to establish that tolling may be warranted for her common law claims until the date

that she, after having left defendants' employ, learned of her rights. Accordingly, defendants have not met their burden of showing that Counts VI, VII, and VIII are conclusively time-barred.

### *2. Fraud Claim (Count VI)*

Defendants next argue that plaintiff's "fraud claim should be dismissed because it arises out of the same alleged conduct as her breach of contract claim and therefore cannot stand as an independent cause of action." Defs.' Mem. at 14. This argument also falls short.

Under D.C. law, for a plaintiff to recover in tort for conduct that also constitutes a breach of contract, "the tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship." *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008). As relevant here, a party has an independent duty not to make fraudulent statements leading to the procurement of the contract, and accordingly a claim of fraud in the inducement is not duplicative of a breach of contract claim. *See id.* at 1088 n.11 ("[A]n insurance company may be liable for fraud and misrepresentation in matters leading to the procurement of the contract . . . ."); *Ludwig & Robinson, PLLC v. BiotechPharma*, LLC, 186 A.3d 105, 111 (D.C. 2018) (stating that "fraud in the inducement . . . is not duplicative of a contract claim," and citing *Marvin Lumber & Cedar Co. v. PPG Indus.*, 223 F.3d 873, 885 (8th Cir. 2000), for proposition that "[c]ourts generally agree that fraud in the inducement, necessarily prior to the contract, is independent of the contract"); *Jacobson v. Hofgard*, 168 F.Supp.3d 187, 200 (D.D.C. 2016) (finding that defendants "possessed a duty, independent of the [s]ales [c]ontract, to make truthful representations about the [p]roperty" at issue in the contract). "Courts have found that the fraudulent inducement theory [*inter alia*] applies when 'a party makes promises at the time of contracting that it intends to break.'" *United States ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37, 51 (D.D.C.), *aff'd*, 709 F.

App'x 23 (D.C. Cir. 2017) (quoting *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 196 (D.D.C. 2011)) (collecting cases).

Plaintiff, who is entitled under Federal Rule of Civil Procedure 8(d)(2) to plead alternative claims to her breach of contract claim, has pled her fraud-in-the-inducement claim with sufficient particularity to survive a motion to dismiss. Plaintiff's complaint alleges ample facts to support her claim that defendants made "false representations to Ms. Agdipa with the purpose of inducing Ms. Agdipa to agree to come to the United States and provide free labor for the Ertays' household." Compl. ¶ 94. For instance, plaintiff alleges that defendants "knowingly made false representations to Ms. Agdipa regarding her future conditions of employment while in the United States, in particular that: (1) Ms. Agdipa's conditions of employment would be fair; (2) her typical working hours would be Monday through Friday from 11:00 a.m. to 5:00 p.m. and on Saturday from 11:00 a.m. to 4:00 p.m. and (3) she would be appropriately compensated." Compl. ¶ 93. Yet instead "she was held in forced labor, subjected to long hours and harsh working conditions." *Id.* ¶ 67. Plaintiff further alleges that at "various times" during her employment with defendants, *id.* ¶ 8—during which at one point she entered into a modified contract in July 2020, *id.* ¶ 38—defendants fraudulently represented that they had the ability to deport her if she complained, *id.* ¶ 53, threatened to call law enforcement on her if she attempted to push back on the conditions they imposed, *id.* ¶ 67, and threatened to withhold her identification and immigration-related documents if she attempted to leave their employ and find other work, *id.* Plaintiff alleges that she "reasonably relied on the Ertays' representations and would not have agreed to work for the Ertays in the United States had she known what her true working and living conditions and compensation would be." *Id.* ¶ 95. These allegations suffice to support her common law fraud claim, and defendants' motion to dismiss Count VI is denied.

### *3. Unjust Enrichment Claim (Count VIII)*

Defendants also contend that plaintiff's unjust enrichment claim, Count VIII, "should be dismissed because the existence of a contract precludes an unjust enrichment claim." Defs.' Mem. at 16-18. For many of the same reasons that plaintiff's fraud claim is not duplicative, plaintiff's unjust enrichment claim is also not precluded.

"Unjust enrichment is an equitable claim that typically lies when there is not a valid contract between the parties." *United States for Use & Benefit of Am. Civ. Constr., LLC v. Hirani Eng'g & Land Surveying, PC*, 26 F.4th 952, 959-60 (D.C. Cir. 2022) (citing *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016), *In re APA Assessment Fee Litig.*, 766 F.3d 39, 45-46 (D.C. Cir. 2014)). Although "[o]ne who has entered into a *valid* contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement," *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 64 (D.C. 2005) (emphasis added), "[i]t is a well settled principle of law that fraudulent representations will vitiate any contract," *Boyce's Ex'rs v. Grundy*, 28 U.S. 210, 212, 7 L. Ed. 655 (1830). *See also First Nat. Bank v. Fox*, 40 App. D.C. 430, 436 (D.C. Cir. 1913) ("Where a party is fraudulently induced to enter into a contract, the fraud cannot be rendered successful by reducing the contract to writing.").

As discussed above, *see supra* Part III.B.2, plaintiff has sufficiently alleged, in the alternative, that no valid contract exists due to defendants' fraudulent representations in procuring the contract. That defendants "do not dispute the validity or enforceability of Plaintiff's Contract" is of no consequence, Defs.' Mem. at 17 n.10; *plaintiff* permissibly challenges the validity of the contract. *See Steiner v. Am. Friends of Lubavitch (Chabad)*, 177 A.3d 1246, 1255 (D.C. 2018) ("On fraud in the inducement, '[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified

in relying, the contract is voidable by the recipient.'" (quoting Restatement (Second) of Contracts § 164 (1981))).[4] Even though plaintiff "ultimately cannot recover under both a breach of contract claim and an unjust enrichment claim pertaining to the subject matter of that contract," she may pursue an unjust enrichment claim as an "alternate theory of liability." *McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 9 n.10 (D.D.C. 2009). Accordingly, defendants' motion to dismiss Count VIII is denied.[5]

## III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss Counts II–IV and VI–VIII of the complaint, ECF No. 18, is DENIED without prejudice. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: August 18, 2026

**BERYL A. HOWELL**
United States District Judge

[4] Defendants' decision to concede to the validity of the contract, and in turn seek dismissal of the fraud and unjust enrichment claims on that basis, may be strategic. Punitive damages are not available for breach-of-contract claims alone, but may be recoverable for claims sounding in fraud. *See Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1173 (D.C. 2004) ("Punitive damages will not lie for breach of contract, even if it is proven that the breach was willful, wanton, or malicious. The only exception to that rule recognized in the District of Columbia is that where the alleged breach of contract merges with, and assumes the character of, a willful tort . . . punitive damages will be available." (internal quotation marks omitted, alterations accepted)).

[5] As defendants' motion to dismiss is denied on all challenged counts, plaintiff's request "in the alternative" for leave to amend her complaint "to set forth additional facts" supporting her opposition to defendants' motion to dismiss is denied as moot. Pl.'s Opp'n at 21-22.